UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:07CR762 HEA |
| | ) |
| JESUS MEDINA ARVIZU, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the Defendant's Motion to Suppress Evidence and Statements [Doc. #48] on March 11, 2008. Further, on April 7, 2008, the Defendant filed a memorandum in support of his motion to suppress, the transcript of the hearing in this matter was filed on April 14, 2008, and on April 18, 2008, the Government filed its response to Defendant's post-hearing memorandum. Thereafter, on April 30, 2008, the undersigned held a supplemental hearing in this matter, and ordered a written transcript be prepared of the supplemental hearing. On May 23, 2008, the transcript of the supplemental hearing was filed in this matter.

Based upon the evidence adduced at the hearings on the motion to suppress, as well as a review of the transcripts and briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Gary Sodoma is a detective assigned to the St. Louis County Narcotics Interdiction Team. He has worked exclusively in narcotics investigations and interdiction for approximately fourteen

years. Among other drug investigations and duties, he works with a canine who is specially trained in the detection of narcotics. His current assignment involves the investigation of individuals who are involved in the shipment and transportation of large amounts of narcotics using the highways, air transportation, and express package facilities such as United Parcel Service. His cases can be initiated by information received from confidential informants or other officers, and he often initiates cases based on his own observations and expertise.

On November 27, 2007, during the early morning, Sodoma was driving through the parking lot of a Motel 6 location in Fenton, Missouri. He noticed a late model Chevrolet Malibu parked in the lot with temporary Arizona license plates. He checked with the department of motor vehicles, and found that the license plates were registered to the Defendant Arvizu, with an address on South Jetty Avenue in Tucson, Arizona. Because Sodoma was aware that Tucson is a rich source-area for large shipments of narcotics and because drug dealers use newly purchased vehicles with temporary plates to transport drugs, Sodoma decided to make further inquiries about the automobile and its occupants.

Sodoma went to the front desk of the motel and checked with the desk clerk, determining that Defendant Arvizu and another individual had arrived at the motel about 1 a.m., registered for one night, and paid in cash for the room. In Sodoma's experience, drug transporters often travel until late in the night so that they can travel as far as possible, pay in cash because their movements are not as easily traced as when they use credit cards, and stay at a motel for only one night, leaving the next morning. Further, after verifying Arvizu's name and address at the motel and from the temporary plate, Sodoma checked to see if Arvizu was on record with the Drug Enforcement Administration anywhere in the United States. After querying DEA's database, Sodoma learned that just six months

prior to November, 2007, law enforcement authorities seized approximately 250 pounds of marijuana from a vehicle owned by Arvizu.

At this point, Sodoma believed that the Defendant had access to and been involved in a shipment of large amounts of drugs in the recent past, and this, combined with the temporary license plates, late travel, payment in cash, and origination of travel in Tucson led Sodoma to believe that further investigation to determine if the Defendant was currently involved in the transportation of narcotics may be fruitful. For this reason, Sodoma asked that a full surveillance team be sent to the Motel 6. Shortly thereafter, a surveillance team of several officers, including DEA Agent Brian Witek and St. Louis County Detective Quinn Turner, arrived at the Motel 6. Eventually, the surveillance team observed Arvizu and a second Hispanic male exit the Motel 6 at about 10 a.m. carrying small travel bags, go to the Chevrolet Malibu, and leave the Motel 6 lot with Arvizu driving and the other Hispanic male in the passenger seat. This type of activity is also consistent with Sodoma's profile of drug transporters and traffickers, in that they stay for one night at a motel, leave the next morning, and travel light.

The surveillance team followed Arvizu onto an outer road running parallel to Interstate 44. Arvizu did not get onto the interstate, but instead stayed on the outer road for about a half mile before stopping at a second budget hotel, the Stratford Inn. When Arvizu arrived at the Stratford Inn, the passenger in Arvizu's vehicle got out of the car, and went into the front door of the motel. According to the desk clerk, this person asked the location of Room 202, and after being informed of its location by the clerk, went to the room. A short time later, Arvizu was observed to leave his car and go into the lobby. He waited for his passenger to return to the lobby, and Arvizu and the other man then walked out of the hotel and got into Arvizu's vehicle. After Arvizu drove off, Det.

3

Quinn Turner, a member of the surveillance team, entered the lobby and talked to the clerk. He determined that the person staying in Room 202 was named Luis Lopez-Garcia, and he arrived late at night the night before and paid cash for his room. Turner determined that Lopez-Garcia was driving a white Ford pickup truck with temporary Arizona license plates. He also determined from the desk clerk that Lopez-Garcia was from Tucson, Arizona. A check of the parking lot revealed that the vehicle that Lopez-Garcia was driving was a white Ford F-250 pickup truck which was pulling a 1969 Ford pickup truck that appeared to be in very bad condition. A check of DEA's database showed that Lopez-Garcia had been involved in a heroin conspiracy some years before November, 2007.

Based on all of the above information, Sodoma believed that the three men may be involved in a conspiracy to transport drugs, and that the drugs were likely being secreted somewhere in the 1969 pickup truck being pulled or towed by the F-250 driven by Lopez-Garcia. He based this on the fact that both of the individuals were from Tucson, Arizona, both had identical temporary tags, arrived late at night, separated, paid for their motels in cash, checked with each other the next morning, separated again, and then began to travel. In addition, both individuals had been involved in drug conspiracies in the past, with Arvizu having been involved in the transportation of a large amount of marijuana within the previous six months.

Because of the above, Det. Sodoma, Agent Brian Witek, and other officers followed Arvizu as he left the Stratford Inn. Det. Turner and another group of surveillance officers and agents maintained their surveillance of the white Ford pick up truck and the 1969 truck being towed by it.

About twenty minutes after Arvizu and the other male left the Stratford Inn, Turner observed Lopez-Garcia exit the Stratford Inn, get into the white Ford pickup truck, and drive away towing the

1969 truck behind it. Turner believed that Lopez-Garcia towing a 1969 pickup truck was suspicious for several reasons. First, Turner knows that there is a lucrative market for pickup trucks along the border with Mexico, and this truck was being towed away from the border area rather than toward it. It was the first time that he had observed a truck being towed in this manner in a northerly direction. Second, the 1969 pickup truck was almost forty years old, and was in such bad condition that Turner was suspicious that it was being towed anywhere at all.

Turner followed the truck eastbound on Interstate 44, and noticed that it entered the highway without signaling that it was changing lanes when getting onto the interstate. Turner requested that Lopez-Garcia be stopped by the Kirkwood Police Department for this violation. A short time later, Lt. Murphy of the Kirkwood Police Department stopped Lopez-Garcia at the Big Bend exit to I-44. When Lopez-Garcia pulled the two trucks to the side of the road, Lt. Murphy and Turner approached the Defendant and informed him of the traffic violation as well as the fact that the temporary license plate was very difficult to see because its view was blocked by the 1969 pickup truck.

Turner asked the Defendant where he was coming from and where he was headed. The Defendant said he was coming to St. Louis from Arizona, and was delivering the two vehicles to a friend in St. Louis who owned them. Turner asked Lopez-Garcia where the friend was located, and Lopez-Garcia said he did not know. Turner asked him where he was driving currently on I-44, and Lopez-Garcia said he was just driving around waiting for his friend to call him on his cell phone. Turner asked Lopez-Garcia the friend's name, and he could only give Turner the person's first name. As Turner continued to ask questions for which Lopez-Garcia had no answers, Lopez-Garcia began to look around and become increasingly nervous. At this point, Turner asked Lopez-Garcia if he could search the two vehicles. Turner did this by stating to Lopez-Garcia that he appeared to be in

5

full control of the vehicles, even though they belonged to a friend, and asked Lopez-Garcia if it was okay for Turner to search the vehicles. Lopez-Garcia granted permission to search the vehicles and asked Turner if he had a written consent form. Turner then provided a written consent form to Lopez-Garcia and read it to him in its entirety. He asked Lopez-Garcia if he understood the form after reading it to him and if he wanted to sign the form giving Turner permission to search the vehicle. Lopez-Garcia answered in the affirmative and signed the consent form.

With Lopez-Garcia's consent, the two vehicles were removed from the side of the road so they could be more safely searched. During the search of the 1969 pickup truck, Turner noticed that the transmission, which was in very bad shape, had apparently been recently dismantled and put back together. Turner loosened the screws on the transmission and immediately found two packages of cocaine. He then completely dismantled the transmission of the vehicle, revealing a total of eighteen packages of cocaine being concealed in the transmission of the 1969 pickup truck. After finding the cocaine, Turner, via radio transmission, informed Agent Witek and the other individuals who were following Arvizu of their discovery.

While Turner was involved in following and searching the trucks being driven by Lopez-Garcia, Agent Witek and other officers followed the Malibu being driven by the Defendant. Witek and the others followed the vehicle to Collinsville, Illinois, where they observed Arvizu and the other individual go into a Wal-Mart store, buy phone cards, and then go to a nearby McDonald's restaurant to eat. During this time, Witek contacted the Collinsville Police Department and asked them to conduct a traffic stop on the Malibu.

A short time later, a uniformed Collinsville police officer stopped the Defendant for improper lane usage. The Collinsville police officer informed the Defendant of the violation, and shortly after

6

this, Witek arrived at the location of the stop and talked to the Defendant. Witek first talked to Arvizu and then to the passenger separately. Witek asked Arvizu where he was headed and what he was doing in the area. Arvizu said that he was traveling to Philadelphia, Pennsylvania, to fix the registration on the Malibu. When asked if he had recently met with anyone, he denied meeting with anyone in the St. Louis area. Witek then asked the passenger, who identified himself as a Mr. Lopez-Iriarte, where he was headed. Lopez-Iriarte said he was traveling to Philadelphia with Arvizu to pay the taxes on the Malibu automobile. Witek also asked Lopez-Iriarte if he had met with anyone in the St. Louis area, and Lopez-Iriarte denied meeting with anyone.

At this point, Witek asked Arvizu for consent to search the vehicle, and Arvizu said that Witek could search the car. Witek also asked Lopez-Iriarte if he could search, and Lopez-Iriarte also consented to the search. After consent was obtained and with both of the Defendants' permission, the Malibu was moved off the interstate highway so that the Malibu could be safely searched. The only item recovered from the search of the Malibu was the temporary Arizona registration in Arvizu's name.

Just as the search was being completed, Agent Witek was informed that Det. Turner had discovered several wrapped packages of cocaine concealed in one of the two trucks being driven by Lopez-Garcia. At this point, Witek told Arvizu and Lopez-Iriarte that they were under arrest because of their association with the individual driving the trucks and that they had been seen at the Stratford Inn in Fenton, Missouri with one of the individuals meeting with Lopez-Irirate. He asked them if they would go to Fenton with them to be further questioned. They stated that they would go to Fenton at this point. When Arvisu and Iriarte arrived in Fenton, Arvizu was interviewed by Agent Witek at the Fenton garage facility. Prior to interviewing Arvizu, Witek advised Arvizu of his rights from a

7

Miranda form. He read the form to Arvizu in English because Arvizu stated that he preferred to use English and apparently understood Witek perfectly. He read him each of the rights from the form out loud, and had him initial the rights to show that he understood the rights. The Defendant Arvizu signed each one of the rights and agreed to speak to Witek after being advised of his rights. He told Witek that he left Tucson to travel to Philadelphia with Lopez-Iriarte and had picked him up in Tucson, and Lopez-Iriarte had asked him to travel to Philadelphia so he could just go there with him. He stated that it was Lopez-Iriarte's idea to go to Philadelphia, and that Lopez-Iriarte had made contact with Lopez-Garcia during the trip. He stated that Lopez-Garcia had asked to borrow the Ford F-150 truck and the 1969 Ford truck, however, both of the trucks belong to Arvizu. He said that these two trucks were in St. Louis, being driven by Lopez-Garcia because that was just a coincidence. He stated that he knew nothing about the cocaine found in the trucks.

## Conclusions of Law

### A. The Initial Stop of the Vehicles Driven by Arvizu and Lopez-Garcia

Based on the above facts, the undersigned concludes that the stop of the F-150 pickup truck being driven by Luis Lopez-Garcia and the Malibu being driven by Arvizu were lawful. As to the initial stop and detention of these vehicles, both the Supreme Court and the Eighth Circuit Court of Appeals have held that, "any traffic violation, however minor, provides probable cause to make a traffic stop." United States v. Maza, 93 F.3d 1390, 1396 (8th Cir. 1996); Whren v. United States, 116 S.Ct. 1769 (1996). In the present case, in addition to the officers observing behavior and activities highly suspicious of drug trafficking, both vehicles were stopped after police officers observed legitimate traffic violations. Thus, the undersigned concludes that, for this reason, the initial stop and detention were lawful.

Further, the undersigned also concludes that the agents had a reasonable, articulable suspicion to stop both vehicles. In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a police officer may stop a person reasonably suspected of criminal activity, question that person briefly to determine whether the officer's suspicions are justified, and conduct a pat-down search for weapons if the officer reasonably believes that the person presents a risk to his safety or the safety of another. See Terry v. Ohio, supra. In explaining the principle of a "Terry" stop, the Supreme Court stated as follows:

> . . .Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion.". . . "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'". . .Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.

Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

Whether officers possess reasonable suspicion is to be determined by the Court "'not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996). Courts afford a great deal of deference to the conclusions of an officer because the officer may detect criminal activity from conduct which seems innocent to the untrained eye. United States v. Cortez, 449 U.S. 411, 418, 422 (1981).

The Supreme Court has held that, when considered together, several innocent acts may be enough to show reasonable suspicion. United States v. Sokolow, 490 U.S. 1 (1989). In Sokolow, supra, the Court held that agents had reasonable suspicion to detain a traveler matching five characteristics common to drug couriers which, when considered together, were not consistent with innocent travel. The characteristics included traveling to a major drug-source city and paying for an

9

airline ticket in cash. Further, courts have held that factors which may lead to reasonable suspicion include the driver of a vehicle having a previous drug arrest for drug possession. United States v. Owens, 101 F.3d 559 (8th Cir. 1996) (officer's observations of prearranged pickups and other activity that is consistent with drug transactions); United States v. Williams, 139 F.3d 628 (8th Cir. 1998); United States v. Trullo, 809 F.2d 108 (1st Cir. 1987) (travel from a drug source area, see United States v. Johnson, 64 F.3d 1120 (8th Cir. 1995)); United States v. Withers, 972 F.2d 837 (7th Cir. 1992) (cash transactions, see Sokolow, supra; United States v. Johnson, supra.).

Based on the above, the undersigned concludes that the totality of the circumstances gave the officers and agents strong reasonable suspicion bordering on probable cause to stop both vehicles. See United States v. Bloomfield, 40 F.3d 910 (8th Cir. 1994). Prior to stopping the vehicles, the agents were aware that both Lopez-Garcia and Arvizu and his passenger, Iriarte, had arrived late at night in the St. Louis area; paid cash for their motel rooms; that their travel originated in Tucson, Arizona, which Sodoma knew from his own experience to be a drug-source city; had almost identical temporary license plates attached to their vehicles; stayed only one night in the motel; left the next morning; were aware that a vehicle registered to Arvizu had transported a large amount of marijuana within the previous six months; were aware that Lopez-Garcia had been involved in a heroin conspiracy, and were suspicious that Lopez-Garcia had no legitimate reason for towing the 40 year-old 1969 pickup truck in a northerly direction. The agents testified that all of the above led them to believe, based on their training and experience, that Arvizu, his passenger, Iriarte, and Lopez-Garcia were actively involved in transporting narcotics most probably hidden in the 1969 Ford pickup. Therefore, the undersigned concludes that the agents were justified in stopping both vehicles and conducting an investigation to determine whether or not the individuals were involved in the

transportation of drugs at that time. This included the questions that were asked about what they were doing in the St. Louis area; where they were coming to and where they were going to, and also asking them to consent to search their vehicles. Therefore, the undersigned concludes that the detention of both vehicles for further investigation was lawful.

B. The Consent to Search the F-150 Pickup Truck and the 1969 Ford Pickup Truck Driven by Luis Lopez-Garcia

The undersigned concludes that the consent to search both the F-150 pickup truck and the 1969 pickup truck was lawful.

Police officers may search a vehicle if they obtain consent to do so from someone who has adequate authority over the vehicle or the item to be searched. The consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. Voluntariness is a fact question to be determined from the totality of the circumstances present. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1974). Further, one not need be aware that he may refuse to consent in order to make consent voluntary. Among the factors to be considered in determining whether consent is voluntary include the following: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises made by the police; whether the defendant's consent occurred in public or a secluded location, and whether the defendant objected to the search or passively looked on. See United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990). Applying the above law to the present case, the undersigned concludes there is little question that the consent to search the trucks was voluntarily given. Lopez-Garcia was not threatened, coerced, or intimidated by the agents; the agents and officers made no promises to Lopez-Garcia to obtain his consent; the consent was given

on a public highway; Lopez-Garcia did not object to any aspect of the search including the search of the transmission of the 1969 Ford; prior to the search being authorized, Lopez-Garcia signed a written consent to search form which was read to him and which he stated he understood, and finally, Lopez-Garcia apparently was quite cooperative and agreed to have the vehicles moved to a safe location before they could be searched. Thus, based on all the aspects stated above, the undersigned concludes that the consent to search was voluntarily given.

As stated above, consent by a third party is valid when that person possesses common authority or other sufficient relationship to the item to be searched. See Matlock, supra; United States v. Wade, 740 F.2d 625, 629 (8th Cir. 1984); Marvin v. United States, 732 F.2d 669, 675 (8th Cir. 1984). In United States v. Beshore, a case very similar to the one now at bar, the defendant, Beshore, had allowed his girlfriend to use and drive his car. While driving and in possession of the vehicle, the defendant's girlfriend was stopped by a police officer and consented to a search of the defendant's car. During the search, methamphetamine laboratory equipment and precursor chemicals were found. In stating that the search was lawful, the Court stated as follows:

> Beshore claims that invalid consent was given for the warrantless search of his car on August 11, 1990. Beshore argues that his girlfriend's consent to search was insufficient.
> . . .
> Third-party consent is valid when "permission to search was obtained from a third-party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171. . .It does not matter that Wilson was not the owner of the car which was searched; common authority is sufficient. Wade, 740 F.2d at 629. Wilson, by having Beshore's permission to use the car and putting her license plates on the vehicle, had common authority over the vehicle. Beshore thus assumed the risk that Wilson would permit the vehicle to be searched. See Matlock, 415 U.S. at 171 n.7. . . The district court did not abuse its discretion in finding that Wilson had common authority over the car and therefore gave valid consent to the search.

United States v. Beshore, 961 F.2d 1380, 1382, 1383 (8th Cir. 1992).

Based on the above law, the undersigned concludes that the facts in this case show that Lopez-Garcia had sufficient authority over the vehicles to allow Turner to search both vehicles. According to the information available to Turner at the time the consent was obtained, Lopez-Garcia had been given the trucks in Tucson, Arizona, and been asked to drive both vehicles unaccompanied for approximately 1,500 miles by a friend of Lopez-Garcia. Turner was aware that Lopez-Garcia had spent the night alone at a motel in the St. Louis area, and had the keys to the vehicle and had apparent access to both vehicles during the trip. Further, when Turner requested permission to search the vehicles, Lopez-Garcia readily assented, and did not indicate that there were areas of the vehicles which were off limits to Lopez-Garcia or which were private and could not be searched by the officer. Therefore, based on all of the above, the undersigned concludes that in the case now at bar as in Beshore, the Defendant, in giving his vehicles to Lopez-Garcia and allowing him to drive them across the country, assumed the risk that Lopez-Garcia would consent to a search of the vehicles. Therefore, the consent to search was valid, and the items seized from the 1969 pickup truck should not be suppressed.

### C. The Consent to Search the Chevrolet Malibu

For the reasons stated above, the undersigned also concludes that the consent to search given by Arvizu and Iriarte were lawful consent searches. Applying Chaidez to the facts of the consent to search in the Arvizu stop, the undersigned concludes that Arvizu was not in custody at the time of the consent to search; he was not threatened in any way nor was he promised anything; he was not punished in order to obtain his consent; the consent occurred on the side of the highway and not while the Defendant was in custody; the Defendant evidenced a cooperative demeanor and agreed

13

to have his car moved to a safe location to be searched, and the Defendant did not object to any aspect of the search. Therefore, the consent to search the Chevrolet Malibu was lawful.

### D. The Arrest of Arvizu

Based on the above, the undersigned concludes that the arrest of Defendant Arvizu was lawful. The undersigned concludes that once the large amount of cocaine was found secreted in the 1969 Ford pickup truck, the agents possessed probable cause to arrest all of the individuals involved in the investigation, including Arvizu. Police officers may arrest a person without a warrant if they have probable cause to believe that the person arrested committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975). All that need be shown is a "fair probability" that a crime has been committed and that the defendant committed the crime in order to establish probable cause. Illinois v. Gates, 462 U.S. 213, 232 (1983). In a case of this nature where all of the agents are working together at two separate locations, the knowledge of the other agents involved in various stops may be imputed to the arresting officers whether or not that information has been specifically relayed to that officer. See United States v. O'Connell, 841 F.2d 1408 (8th Cir. 1988).

In Maryland v. Pringle, 540 U.S. 366 (2003), a Baltimore police officer stopped a vehicle with three occupants for a traffic violation. The defendant in this case, Pringle, was a front seat passenger. When the officer asked the driver of the vehicle for the vehicle registration, the officer observed a large amount of cash in the glove compartment of the car when it was opened to retrieve the registration. Because of this, the officer asked the driver for permission to search the car and obtained consent. During the search of the vehicle, $763 was found in the glove compartment and five plastic glassine baggies containing cocaine were retrieved from behind the back-seat armrest. When the officer questioned all three men, they denied ownership of the drugs and the money even

14

though the officer told them if no one admitted to ownership he was going to arrest all of them. After they all denied ownership, they were placed under arrest and taken to the police station. In holding that all of the individuals, including the front seat passenger, were lawfully arrested even though the narcotics were found behind the armrest in the back seat, the Court stated as follows:

> To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. . .
>
> In this case, Pringle was one of three men riding in a Nissan Maxima at 3:16 a.m. There was $763 of rolled-up cash in the glove compartment directly in front of Pringle. Five plastic glassine baggies of cocaine were behind the back-seat armrest and accessible to all three men. Upon questioning, the three men failed to offer any information with respect to the ownership of the cocaine or the money.
>
> We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.

Maryland v. Pringle, 540 U.S. 366, 371, 372.

In United States v. Zamudio-Carrillo, 499 F.3d 1206 (10th Cir. 2007), a case very similar to the case now at bar, a Kansas State Trooper observed a Ford Explorer with Arizona specialty license plates traveling on an interstate highway in Arizona. As the Explorer passed the trooper, the trooper suspected that the Explorer contained a false compartment because the rear of the vehicle was raised higher than normal. Because of this, the trooper turned his vehicle around on the interstate and attempted to catch up to the Explorer. As he pursued the Explorer, he passed a green Ford Escape traveling behind the Explorer which displayed exactly the same type of Arizona specialty plate. As the trooper pulled over the Ford Explorer, he noticed that the Ford Escape which passed him contained not only the same Arizona specialty plates but that the numbers on the plates were very

15

close to each other. He believed that the vehicles were traveling together based on the proximity of their license plate numbers and because they were traveling close to each other. After stopping the Explorer, the trooper found a false compartment from which eventually twenty-three kilograms of cocaine were recovered. Based on this recovery and his belief that the Escape was traveling with the Ford Explorer, the trooper radioed ahead and ordered that the Escape be stopped. The Escape was eventually stopped, and the defendant Zamudio-Carrillo was arrested. Several kilograms of cocaine were also eventually discovered in Zamudio-Carrillo's vehicle. In upholding the arrest of Zamudio-Carrillo in the Ford Escape, based on the seizure of the cocaine from the Explorer, the Court stated as follows:

> . . .Rule reasonably inferred from the sequential numbering that the two tags had been purchased at the same time or one immediately after the other, indicating a connection between the two vehicles. Despite this apparent connection, however, Beltran-Lugo twice denied she was traveling with the driver of the Escape. Rule testified he was aware from prior experience that individuals smuggling drugs frequently travel in tandem although they usually deny it. All these facts, taken together, lead to the reasonable conclusion Zamudio-Carrillo's vehicle was connected to Beltran-Lugo's illegal activity. These circumstances make this case distinguishable from *Valenzuela*.
>
> We conclude there is ample support for the conclusion Trooper Harvey had probable cause to arrest Zamudio-Carrillo based on an objectively reasonable suspicion he was traveling in tandem with a vehicle transporting drugs in a hidden compartment and, thus, involved in criminal activity. Accordingly, Zamudio-Carrillos's arrest, detention, and the subsequent inventory search of his vehicle did not violate the Fourth Amendment. . .

499 F.3d 1206, 1210.

As stated above, the undersigned concludes that when the large amount of cocaine was discovered in the 1969 pickup truck, there was probable cause to arrest all three of the individuals involved in the investigation. The undersigned concludes that the evidence shows that there was a "fair probability" that all the individuals were traveling together. In this regard, all three of the

16

individuals arrived at adjacent motels at approximately the same time. They live in the same city; their vehicles have almost identical Arizona temporary license plates; not only did the vehicles arrive at approximately the same time at approximately the same location, they did so after traveling more than 1,500 miles from Tucson, Arizona; they met at a separate hotel before departing in the morning, and finally, they obviously had been in contact with one another during their trip because Arvizu and his passenger, Iriarte, were aware of the room number which Lopez-Garcia was staying in when they arrived at the Stratford Inn Motel. Therefore, they had to be informed of the room number by Lopez-Garcia prior to their arrival.

In addition to all of the facts stated in the section above related to the reasonable suspicion to stop the two vehicles, the undersigned concludes that the responses of Lopez-Garcia and Arvizu and his passenger, Iriarte, once the stops were made, added to the suspicion and probable cause to arrest all of the Defendants. When Arvizu was questioned about what he was doing in the St. Louis area and where he was going to, he said he was driving his Malibu vehicle almost all the way across the country to register the vehicle in Pennsylvania. Sodoma testified at the hearing that this response would make him highly suspicious because it was unnecessary to drive a vehicle 3,000 miles in order to register the vehicle. In addition, the vehicle already had been validly registered in Arizona, which is where the Defendant lives. Further, both Arvizu and Iriarte denied meeting with Lopez-Garcia after they were observed to go to the Stratford Inn Motel and request directions to the room in which Lopez-Garcia was staying. As to Lopez-Garcia, his responses were likewise highly suspicious. Lopez-Garcia stated that he had driven the two trucks all the way from Tucson, Arizona to deliver them to a friend whose last name he did not know, and that this delivery was to be made to an unknown location. He told the officer that he was just "driving around" waiting for a phone call.

17

Once the large amount of cocaine was found in the 1969 pickup truck, a logical conclusion is that the person from whom Lopez-Garcia was waiting for a phone call was Arvizu or the passenger, Iriarte. This conclusion is bolstered by the fact that Arvizu was involved in exactly the same type of activity (his vehicle being used in the transport of large amounts of narcotics) only six months before this date. Thus, based on all of the above, the undersigned concludes that there was at least a "fair probability" that Arvizu, Arvizu's passenger, Iriarte, and Lopez-Garcia were acting together in the transport of the large amount of cocaine discovered in the pickup truck. Thus, the arrest of Arvizu was lawful. See Maryland v. Pringle, supra; United States v. Zamudio-Carrillo, supra.

E. Post-Arrest Statement[1]

The undersigned concludes that the Defendant's statement after he was arrested and which was made at the Fenton garage was lawful and should not be suppressed. Prior to the statement being made, the Defendant was advised of his full Miranda rights in English because he stated that he wished to have the rights read to him in English. The agent, who was fully fluent in Spanish and English, had spoken to the Defendant in both Spanish and English during the stop in Collinsville, Illinois. The Defendant was read his full Miranda rights from an advice of rights form, he signed each

---

[1] The undersigned concludes that the statements made by the Defendant prior to his arrest should not be suppressed. The Supreme Court has held that in most Terry stop situations, the Defendant is not in custody for Miranda purposes and the Defendant does not have to be given Miranda rights. In the case now at bar, the undersigned concludes that the Defendant was not in custody until he was formally placed under arrest. As far as the Defendant was concerned, he had been stopped for a minor traffic violation, and the undersigned concludes that a reasonable person would not think he was in custody standing on the side of an interstate highway after being stopped for what he believed to be a traffic violation. See Berkemer v. McCarty, supra; United States v. Boucher, 909 F.2d 1170, 1174 (8th Cir. 1990); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). Further, the Defendant was not threatened in any way nor was he promised anything in return for his statements. Therefore, the undersigned concludes that the Defendant's pre-arrest statements were voluntarily made.

right stating he understood his rights, and he waived his rights in writing, stating that he was willing to talk to the agent. The record shows that he was not threatened or promised anything in order to waive his rights or make the statement, and evidently the conversation and interview were cordial. Based on the above, the undersigned concludes that the Defendant was fully and completely advised of his rights by the agents and knowingly waived his rights. The undersigned further concludes that based on the totality of the circumstances, the Defendant's statement was voluntarily made, and his free will was not overborne by anything that took place during the interview. Miranda v. Arizona, 384 U.S. 436, 467, 475 (1966); North Carolina v. Butler, 441 U.S. 369, 374-75 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1985). Therefore, the statement should not be suppressed.

## Conclusion

Therefore, based on the above, the Defendant's motion to suppress evidence and statements should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements [Doc. #48] be **denied**.

Further, the parties are advised that they have until **July 7, 2008**, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Finally, the trial of this matter has been set on **August 11, 2008** at **9:30 a.m.** before the Honorable Henry E. Autrey, United States District Judge, Courtroom 10-North.

/s/ Terry I. Adelman  
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of June, 2008.